In re WESTERN PACIFIC AIRLINES, INC., a Delaware corporation, Employer ID No. 86–0758778, Debtor.

Bankruptcy No. 97–24701 SBB.
MC No. FB–25.

United States Bankruptcy Court, D. Colorado.

Dec. 10, 1997.

**AMENDED ORDER AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTIONS 364(c)(1) and 364(d) OF THE BANKRUPTCY CODE**

SIDNEY B. BROOKS, Bankruptcy Judge.

Upon the Motion (the "Motion") dated November 18, 1997 filed by Western Pacific Airlines, Inc. debtor and debtor in possession (the "Debtor"), seeking an order of this Court pursuant to §§ 364(c)(1) and 364(d) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (1) authorizing the execution, delivery and performance by the Debtor of a Credit Agreement, dated December 3, 1997 (the "Credit Agreement;" capitalized terms used herein and not otherwise defined herein shall have the meanings given to such terms in the Credit Agreement), entered into between the Debtor and Energy Management Corporation ("Energy") and Sundance Venture Partners, L.P. II (collectively, the "Lenders"), and (2) authorizing the Debtor to obtain postpetition financing (the "Financing") pursuant to the Credit Agreement up to the principal amount of $30,000,000 (a) with priority subject to the Carve–Out (as defined below) over any and all administrative expenses of the kind specified in §§ 503(b) and 507(b) of the Bankruptcy Code pursuant to § 364(c)(1) of the Bankruptcy Code, and (b) to be secured pursuant to § 364(d)(1) of the Bankruptcy

Code by a valid and perfected first priority senior security interest in and to the Collateral (as that term is defined in the Security and Pledge Agreement), including all of the property, assets or interest in property or assets of the Debtor of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including, without limitation, all property of the estate (within the meaning of the Bankruptcy Code) of the Debtor, including proceeds of any Avoidance Actions and Aircraft Leaseholds (as defined in the Security and Pledge Agreement) and all proceeds, rent, products and profits of the foregoing, prior to all other liens and interests, other than Permitted Liens; and pursuant to Bankruptcy Rule 4001(c)(1), due notice of the Motion having been given to the parties on the Limited Service List pursuant to this Court's Case Management Order and to those entities who have or claim a lien against any of the Debtor's assets; and upon the record of the hearing held on December 3, 1997 and upon all of the pleadings filed with the Court and all of the proceedings had before the Court, and after due deliberation and consideration and sufficient cause appearing therefor;

It is FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1. This Court has core jurisdiction over these proceedings and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.

2. The Motion (as amended, with such amendments reflected in the Credit Agreement) shall be, and hereby is, granted in all respects and all objections have either been resolved or are overruled.

3. The Debtor has an immediate need to obtain financing (i) to permit the orderly continuation of its business so the Debtor may reorganize and maximize the benefit to the creditors and the estate and (ii) to satisfy other working capital needs.

4. The Debtor is unable to obtain adequate unsecured credit allowable under § 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtor is also unable to obtain credit secured only by security interests or liens junior to the existing security interests or secured by liens on unencumbered property of the estate pursuant to §§ 364(c)(2) or (3) of the Bankruptcy Code. A facility in the amount provided by the Credit Agreement is unavailable to the Debtor without the Debtor granting to the Lenders (i) pursuant to § 364(c)(1) of the Bankruptcy Code, allowed claims, with respect to all indebtedness and obligations of the Debtor under the Credit Agreement, having priority over any and all administrative expenses of the kind specified in §§ 503(b) and 507(b) of the Bankruptcy Code other than the Carve–Outs (defined below), and (ii) pursuant to § 364(d)(1) of the Bankruptcy Code, security for such obligations by the granting of a first priority valid and perfected senior security interest in and to the Collateral (as that term is defined in the Security and Pledge Agreement), including all of the property, assets or interest in property or assets of the Debtor of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including, without limitation, all property of the estate (within the meaning of the Bankruptcy Code) of the Debtor, including proceeds of any Avoidance Actions and Aircraft Leaseholds (as defined in the Security and Pledge Agreement) and all proceeds, rent, products and profits of the foregoing, prior to all other liens and interests, other than Permitted Liens. The ability of the Debtor to obtain sufficient working capital and liquidity through the incurrence of indebtedness for borrowed money and other financial accommodations is vital to the Debtor. The preservation and maintenance of the going concern value of the Debtor is integral to a successful reorganization of the Debtor pursuant to the provisions of Chapter 11 of the Bankruptcy Code.

5. The Credit Agreement, the Pledge and Security Agreement, and all exhibits and other documents ancillary thereto have been negotiated in good faith and at arm's length between the Debtor and the Lenders and any credit extended and Loans made to the Debtor by the Lenders pursuant to the Credit Agreement shall be deemed to have been extended by the Lenders in good faith, as that term is used in § 364(e) of the Bankruptcy Code.

6. The Debtor is immediately authorized to borrow pursuant to the Credit Agreement up to an aggregate of $30,000,000 for the purposes, and upon the terms and conditions, provided for by the Credit Agreement.

7. The Debtor is expressly authorized and empowered to execute and deliver, among other documents, the Credit Agreement, the Security Agreement and the Note in the form submitted to the Court (collectively, the "Loan Documents"). The terms and conditions of the Loan Documents are approved and the Debtor is authorized to execute, deliver and perform and do all acts that may be required in connection with the Loan Documents. Upon execution and delivery of the Loan Documents, the Loan Documents shall constitute valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with their terms.

8. The obligations of the Lenders to extend Loans under the Credit Agreement are expressly subject to the conditions provided for in the Credit Agreement.

9. Subject only to the exceptions expressly set forth in the Credit Agreement for all of the Debtor's obligations and indebtedness arising under the Credit Agreement and the other Loan Documents, the Lenders hereby are granted pursuant to § 364(c)(1) of the Bankruptcy Code an allowed claim having priority over any and all administrative expenses of the kind specified in §§ 503(b) and 507(b) of the Bankruptcy Code; from which claim a Carve–Out shall and hereby is made for the payment of (a) amounts payable pursuant to 28 U.S.C. § 1930(a)(6); (b) accrued and unpaid and future professional fees and expenses incurred by the Unsecured Creditors Committee and Committee member expense reimbursements in an aggregate amount not to exceed $350,000, and (c) accrued and unpaid and future professional fees and disbursements incurred by the Debtor in an aggregate amount not to exceed $600,000 (the "Carve–Outs"). Other than the Carve–Outs, no other claim, having a priority superior or *pari passu* to that granted by this Order to the Lenders shall be granted while any amount under the Credit Agreement is unpaid or the commitment to extend further financing thereunder remains outstanding.

10. No costs or expenses of administration of the Debtor's Chapter 11 case or any future proceeding or case which may result therefrom (including in any superseding chapter 7 case) shall be charged against the Collateral, pursuant to § 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the Lenders and no such consent shall be implied from any action, inaction, or acquiescence by the Lenders.

11. Subject only to the exceptions expressly set forth in the Credit Agreement as security for all of the Debtor's obligations and indebtedness arising under the Credit Agreement and the other Loan Documents, the Lenders hereby are granted (effective immediately and without the necessity of the execution by the Debtor of security agreements of otherwise), pursuant to § 364(d)(1) of the Bankruptcy Code, (a) a first priority senior security interest in and lien upon all of the Collateral including, without limitation, the Pledged Stock; the proceeds of any kind resulting from any disposition of any Aircraft Leasehold, including proceeds in respect of any assumption and assignment of any Aircraft Leasehold, and including but not limited to any consideration payable by assignees to the Borrower for the right to obtain the assignment or any reimbursement to the Borrower of security deposits or maintenance reserves resulting from the assignee's assumption and performance of the obligation to pay such deposits or reserves; together with the proceeds thereof and the earnings thereon, such security interests and liens described in this paragraph being senior in all respects to any and all future liens, if any, which may encumber such Collateral and (b) a lien and security interest in all encumbered Collateral junior in priority only to valid encumbrances existing on the date of this Order, but excluding in all events the Excluded Property as defined in the Security and Pledge Agreement. The security interests and liens granted to the Lenders hereunder (i) shall not be (a) subject to any lien or security interest which is avoided and preserved for the benefit of the Debtor's estate under § 551 of the Bankruptcy Code

or otherwise or (b) subordinated to or made *pari passu* with any other lien or security interest under § 364(d) of the Bankruptcy Code or otherwise and (ii) are deemed valid, perfected and enforceable liens at all times from and after the date of entry of this Order, without regard to whether such liens and security interests are perfected under applicable non-bankruptcy law. Notwithstanding anything to the contrary, proceeds of the Collateral shall be applied in accordance with the priorities set forth in Section 5.8 of the Security and Pledge Agreement.

12. If an Event of Default has occurred and is continuing, the Lenders shall have the following rights, among others:

(i) to direct the Debtor to assume and assign pursuant to § 365(f) of the Bankruptcy Code any Aircraft Leasehold to an assignee designated by the Lenders;

(ii) to direct the Debtor to seek any consent (other than the consent of the lessor) necessary to the assumption and assignment or the assignment of any Aircraft Leasehold;

(iii) to collect any proceeds payable to the Debtor as a result of any disposition of the Aircraft Leasehold, including but not limited to any consideration payable by the assignees to the Debtor for the right to obtain the assignment or any reimbursement to the Debtor of security deposits or maintenance reserves resulting from the assignee's assumption and performance of the obligation to pay such deposits or reserves.

13. The Debtor shall use the amounts borrowed under the Credit Agreement only for the purposes permitted thereunder.

14. The Lenders shall not be required to file or record financing statements, notices of lien or similar instruments in any jurisdiction or to take any other action to validate and perfect the security interests and liens granted to it pursuant to this Order. The automatic stay is hereby modified solely for the purpose of authorizing Lenders to record financing statements, notices of liens or similar statements as the Lenders deem reasonably necessary.

15. In making decisions to make Loans to the Debtor under the Credit Agreement or to collect the indebtedness and obligations of the Debtor arising thereunder, the Lenders shall not be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation, and Liability Act, as amended, or in any similar federal or state statute).

16. Upon request of the Lenders, the Debtor is directed to take, execute and deliver such instruments and do all things necessary to perfect, preserve and enforce the security interests and liens granted to the Lenders by the Loan Documents and this Order.

17. The Debtor is authorized and directed to do and perform all acts, to make, execute and deliver all instruments and documents to consummate the transactions described in the Credit Agreement (including, without limitation, the Loan Documents and related security documents and financing statements).

18. The Debtor is authorized and, as provided in the Credit Agreement, directed to pay the following fees under the Credit Agreement: (i) the remaining nonrefundable portion of the Facility Fee in the amount of $125,000; (ii) the second enumerated Termination Fee of $150,000 (which fee shall be in accordance with Section 2.4(d) of the Credit Agreement); (iii) the third enumerated Termination Fee of $1,000,000 upon the occurrence of the Effective Date, and 10 percent of each class of equity of the reorganized Debtor upon the occurrence of the Subsequent Advance Date; (iv) the Extension Fee in the amount of $500,000 payable on March 16, 1998 unless the Financing has been repaid in full and terminated prior to such date; (v) the Commitment Fee of 0.5 percent per annum on the unused amount of the Financing; (vi) the Expense Reimbursement referred to in the Credit Agreement; and (vii) such other costs and expenses as may be due from time to time including, without limitation, reasonable attorneys' fees and dis-

bursements as provided in the Loan Documents.

19. Upon either (a) the occurrence of an Event of Default (as defined in the Credit Agreement) or (b) termination of the Financing thereunder, the automatic stay granted by § 362 of the Code shall be lifted to permit foreclosure on the Collateral upon five business days' notice of the Event of Default or termination event by the Lenders to the Borrower, the Unsecured Creditors' Committee and Hunt Petroleum/GFI. During such five-day period after such notice, the Borrower and the Unsecured Creditors' Committee shall have the right to prevent such lifting of the automatic stay on the sole basis that such Event of Default or termination event has not occurred. If the stay is lifted and the Lenders initiate any foreclosure on Collateral in which Hunt/GFI claims an interest, then Hunt/GFI shall have relief from the stay also to foreclose only such Collateral.

20. The Loan Documents and the provisions of this Order shall be binding upon the Lenders and the Debtor and their respective successors and assigns (including any trustee hereinafter appointed or elected for the estate of the Debtor) and shall inure to the benefit of the Lenders and the Debtor and (except with respect to any trustee hereinafter appointed or elected for the estate of the Debtor) their respective successors and assigns.

21. If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (a) the validity of any obligation, indebtedness or liability incurred by the Debtor to the Lenders prior to written notice to the Lenders of the effective date of such reversal, stay, modification or vacation, or (b) the validity and enforceability of any lien or priority authorized or created hereby or pursuant to the Loan Documents. Notwithstanding any such reversal, stay, modification or vacation, any indebtedness, obligation or liability incurred by the Debtor to the Lenders prior to written notice to the Lenders of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the Loan Documents and the original provisions of this Order, and the Lenders shall be entitled to all the rights, remedies, privileges and benefits, granted herein and pursuant to the Loan Documents with respect to all such indebtedness, obligation or liability.

22. The provisions of this Order shall be effective upon entry of this Order. All actions taken pursuant to this Order and the terms of this Order shall survive the entry of, and shall govern with respect to any conflict with, any order that may be entered confirming a plan of reorganization of the Debtor or that may be entered converting the Chapter 11 case of the Debtor to a Chapter 7 case. No order confirming a plan will alter or impair the rights of the Lenders under this Order without the prior written consent of the Lenders. The terms and provisions of this Order as well as the liens and security interests and all rights of the Lenders and all obligations of the Debtor created or arising pursuant to this Order shall continue in this Chapter 11 case and any superseding proceedings under the Bankruptcy Code, and such liens and security interests shall maintain their priority as provided by this Order until all Loans are satisfied by payment in full and are thereby discharged.

23. To the extent any of the terms and conditions of the Credit Agreement are in conflict with the terms of this Order, the provisions of this Order shall control.

24. The notice given by the Debtor of the Motion constitutes due and sufficient notice of the Motion.

25. Notwithstanding anything to the contrary, the Lenders shall have no rights to recoupment or any other rights with respect to: (1) any payments made in respect of fees and expenses of professionals under §§ 330, 331 and 1103 of the Bankruptcy Code, including the out-of-pocket costs and expenses of individual members of the Creditors' Committee, accrued, but unpaid, as of December 1, 1997 (nothing contained herein shall prevent the Lender from objecting to the allowance of any fees and expenses of such professionals); (ii) any Carve–Out Expenses; (iii) court-approved adequate protection payments in the nature of prepayments or substantially contemporaneous payments for

goods and services provided to the Borrower; and (iv) any other administrative expenses paid or incurred by the Borrower in the ordinary course of business during the Chapter 11 Case.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW TO SUPPLEMENT ORDER AUTHORIZING DEBTOR TO OBTAIN POST PETITION FINANCING

This matter came on before the Court for hearing on December 3, 1997 on the Debtor's Motion for Order Authorizing Debtor to Obtain Post–Petition Financing Pursuant to 11 U.S.C. § 364(c), (d) ("the Motion"). The following are the Court's findings of fact and conclusions of law pursuant to Fed. R.Bankr.P. 52(a) to supplement this Court's order granting the Motion. The Court further incorporates the findings of fact and conclusions of law set forth on the record at the conclusion of the December 3, 1997 hearing.

Pursuant to the Motion, the Debtor seeks approval of certain financing with Smith Management Company or its designated affiliate ("Smith Management"). The basic terms of the proposed financing are set forth in a term sheet attached to the Motion. In general, the term sheet calls for a $10 million advance on December 4, 1997 and an additional $20 million on or before December 20, 1997 upon satisfaction of certain conditions precedent. Pursuant to negotiations between Smith and the Unsecured Creditors Committee ("Creditors Committee"), certain terms have been modified for the benefit of the estate and its creditors, and are set forth in the loan documents tendered to the Court.

To prevail on the Motion, the Debtor has the burden of proof on four issues: first, that the proposed financing is an exercise of sound and reasonable business judgment; second, that no alternative financing is available on any other basis; third, that the financing is in the best interests of the estate and its creditors; and, as a corollary to the first three points, that no better offers, bids, or timely proposals are before the Court. The Debtor has carried its burden of proof on each of the above issues.

The Court notes that the terms of the financing are onerous, costly, and tough. The terms mandate ceding a not insignificant amount of control over the Debtor to Smith Management. The terms may well impede another party's attempt to propose a competing plan on a level playing field. Moreover, the proposed terms are virtually unique, at least insofar as the experience of this Court and most of the participants at the hearing are concerned.

On the other hand, the terms reflect this Debtor's situation and the market in which the Debtor is forced to participate as a result of its financial circumstances and the deadlines it faces. The terms are not unconscionable, oppressive or punitive, nor are such terms unexpected for such a significant loan attended by significant risk. The proposed financing is undercollateralized, especially when Smith Management has advanced the full $30 million. Even the first "tranche" of $10 million is not solidly or well-collateralized. For obvious reasons, the Debtor has been unable to locate any comparable financing on any terms or any other proposal.

The terms of the financing have been negotiated at arms length, and this process of compromise and negotiation has resulted in some important moderating features to the original financing proposal. For example, the right of Smith Management to appoint directors to the Debtor's Board will not occur until Smith Management has committed to infuse the second "tranche" of $20 million. Similarly, the requirement to deliver to Smith Management 10 percent of the equity of any reorganized Debtor will not be effective until Smith Management's commitment to infuse the full $30 million. The Court recognizes that the Creditors Committee has been central and effective in the negotiating process and now gives its unanimous and enthusiastic support of the financing proposal. This support is very persuasive to the Court, as the Creditors Committee has been extremely active and represents a large portion of the unsecured creditors' claims in this case.

The Court recognizes that Smith Management is not being altruistic in this matter, but must also recognize that Smith Management has stepped forward and acted in good

faith. The Court recognizes that Smith Management lends in more risky situations from which other lenders might shy. Smith Management also has experience in operating businesses and direct experience in the business of operating an airline (Hawaiian Airlines) that is roughly comparable to this Debtor. These factors support the Debtor's exercise of business judgment in the best interests of the estate and its creditors.

A number of aircraft lessors objected to the assignment to Smith Management of the Debtor's leasehold interests as lessee under its aircraft leases, for collateral purposes. The objections were well taken, but Smith Management and the Debtor have agreed to changes in the structure of the financing to meet these objections. Instead of an assignment of the Debtor's leasehold interests, Smith Management will be granted, in effect, a lien or priority in the Debtor's powers under § 365(f) of the Bankruptcy Code. Thus, Smith will have the right to direct the Debtor to assume and assign the leases, subject to all of the protections for the lessors which are offered by § 365(f).

Some of the lessors have objected to even the grant of such a lien or right to Smith Management. In this regard, the Court relies on the case of *Ernst Home Center, Inc.,* 209 B.R. 974 (Bankr.W.D.Wash.1997). The facts in *Ernst* are different in some important respects, but the reasoning is persuasive. In light of that reasoning, the pledge to Smith Management of the right to direct the Debtor to exercise its powers under § 365(f) is not an improper use of the financing tools available to the Debtor in Possession. The Court notes that the undermarket aircraft leases may have significant value for the estate. But for the loan being approved, all of that value would be dissipated. The Court therefore adopts the reasoning of *Ernst Home Center* to the extent that it applies here.

■ The aircraft lessors also argue against the rights to be granted to Smith Management, claiming that § 1110 of the Bankruptcy Code overrides the Debtor's power to assume and assign leases under § 365(f). The position of the aircraft lessors was raised and briefed in the objection to the Motion filed by Boullioun Aircraft Holding Company, Inc. Smith Management has requested that the matter be resolved by this Court now out of good business judgment to achieve certainty on a going forward basis. Accordingly, the Court will address the issue.

The lessors maintain that § 365 is "trumped" by § 1110. Those leases tendered to the Court provide by their terms that they cannot be assigned without the consent of the lessors (although in some circumstances, that consent cannot be unreasonably withheld). In essence, the lessors have asserted that, as a result, they hold a veto power over the Debtor's right to assume and assign under § 365(f).

The Court notes the case law provides little, if any, guidance regarding what could be a significant issue. The Court is, however, somewhat familiar with the legislative history of § 1110 and cases interpreting that section. Both the legislative history and all of the cases addressing both § 1110 and § 365 of the Bankruptcy Code discuss the compatibility of the two provisions, not their mutual exclusivity. The Court further notes that Congress made no attempt to craft the language of § 1110 to override § 365, although the statute specifically mentions §§ 362, 363 and 1129. One may also examine the explicit language of 11 U.S.C. § 553 by way of comparison (exempting the right of offset from many of the Code's provisions). Further, the language of § 1110 parallels the language of § 365(d), and the latter language clearly does not override § 365(f). For that and the other reasons argued by the Debtor, the better interpretation which comports with the rules of statutory interpretation is that § 365(f) is not overridden by § 1110, but rather coexists with it. As a result, the Debtor has the authority to assume and assign aircraft leases under § 365(f), even without the consent of the lessors.

The Court recognizes that § 1110 was crafted to protect aircraft lessors because of the substantial capital involved. The Court's interpretation still respects the special protections granted to lessors by § 1110. The provisions of § 1110 survive with regard to further defaults and provide a quick, clean, and effective remedy for the lessors.

The aircraft lessors, along with others, also object to the grant of "superpriority" to Smith Management pursuant to 11 U.S.C.

§ 364(c)(1). The Court notes that the lessors do not face the same risks or disadvantages as many of the creditors. Uniformly, the lessors have two to three months of security deposits. Moreover, they have the right to receive approximately $6 million in cure payments on December 4 to be provided by the proposed financing. Further, as noted, the lessors have the protections of § 1110 with regard to the leased aircraft.[1]

The Court finds that the Smith Management financing is a unique credit facility and that the award of superpriority is justified here. As noted, the loan is largely unsecured. The unrefuted expert testimony, echoing the Debtor's own projections presented at hearing, is that the Debtor is reasonably likely to be cash neutral in April, 1998 and profitable thereafter. The exhibits tendered by the Debtor support this contention. The Court recognizes that the Debtor faces a difficult period ahead for the next 30 to 60 days, but is persuaded by the knowledgeable expertise of both the Debtor and the Committee's expert, Wakelee Smith of Simat, Hiellesen & Eichner.

The Court notes that the value to the estate of the aircraft leaseholds would be eliminated if no loan is made. Under the circumstances, it is not an unreasonable shift of the risk to grant to Smith Management a superpriority for the substantial new money which the Debtor will receive and the risk Smith Management will undertake. Especially with regard to the aircraft lessors, the result does not put any creditor at substantially greater risk than any creditor faces if the loan is not made. Section 364(c)(1) is in the Code for a reason. Appropriate circumstances justifying its invocation are rare, but they are present here.

The potential profitability of the Debtor and its prospects for reorganization if the financing is granted must be measured against the alternative, which is the immediate collapse of the Debtor as a going concern. If the loan is not made, the consequences will be complete and irreversible. The Court recognizes that reorganization is not a goal to be achieved at all costs, but that the leases

could have substantial value which would be lost to the estate if the loan were not approved. The prospects for recovery by the creditors in a liquidation are dim.

Various creditors have argued that the loan terms call for too great a delegation of the Debtor's fiduciary duties, which they claim results in a breach of fiduciary duty. The Court disagrees; no breach of fiduciary duty is involved by the Debtor's agreement to grant Smith Management some measure of control over its investment. Indeed, for the Debtor and its management to have walked away from the Smith Management offer would have been a much more questionable decision than to proceed with it, given the unpalatable alternative for the Debtor, its creditors, and the traveling public.

On all other matters not addressed herein, the Court adopts the positions set forth in the Debtor's Memorandum of Law in Support of Motion for Order Authorizing Debtor to Obtain Post–Petition Financing Pursuant to 11 U.S.C. § 364(c), (d). All other objections are therefore overruled and denied.

---

1. Hunt Petroleum, Inc. and GFI also objected to the grant of superpriority based upon the mere potential that these creditors might be inadequately protected with regard to their security interest. The Court finds the possibility to be insufficient grounds to deny priority to Smith Management under § 364(c)(1).