**Delbert C. BLAND d/b/a Bland Farms, Debtor,**

v.

**FARMWORKER CREDITORS,**
**Appellants,**

v.

**Delbert C. Bland, Appellee,**

and

**Flag Bank, Appellee.**

No. 6:02cv00136.

United States District Court,
S.D. Georgia,
Statesboro Division.

Nov. 14, 2003.

James L. Drake, Jr., James L. Drake, Jr., PC, Savannah, GA, for Delbert C. Bland.

Lisa J. Krisher, Dawson Morton, Georgia Legal Services, Atlanta, GA, for Farmworker Creditors.

Robert M. Mercer, Stokes, Lazarus & Carmichael, LLP, Atlanta, GA, for Flag Bank.

Jack K. Berry, pro se, Savannah, GA, U.S. Trustee.

## ORDER

EDENFIELD, District Judge.

## I. INTRODUCTION

This appeal arises from the bankruptcy of Delbert C. Bland, d/b/a Bland Farms (Bland), an onion farmer who failed to pay some of his farm workers. The "Farm-

1. The Court will cite to its "blue-jacketed" file labeled 602CV136 as "doc. # __" and the bankruptcy court records, including hearing transcripts, as "R. __."

2. The debtor's assets are then collected into the estate for orderly distribution to creditors based on priorities set forth in the Code. *See*

worker Creditors" challenge the bankruptcy court's approval of a new financing lender's (NFL's) "superpriority lien" granted to it under 11 U.S.C. § 364—a result that virtually eliminates the appellants' chance of getting paid. Doc. # 2.[1]

The § 364 ruling, they contend, impermissibly allowed the lender to cross-collateralize the NFL's prepetition loans with the debtor's postpetition assets to the detriment of unsecured claimants like the Farmworkers. *Id.* at 2. The NFL insists that the bankruptcy court committed no error. Doc. ## 7–8, 10

This Court reviews bankruptcy court fact findings for clear error, and conclusions of law *de novo*. *See In re Levine*, 134 F.3d 1046, 1049 (11th Cir. 1998); *In re Williams*, 216 F.3d 1295, 1296 (11th Cir.2000).

## II. ANALYSIS

### A. The Prism

Reasonably sophisticated financing ("cross-collateralizing loans") and bankruptcy ("superpriority administrative claims") terms percolate throughout this case. *See* doc. # 2; # 7. The resulting complexity leads this Court to a path of reasoning and result perhaps best understood by first reviewing (and thus creating a comprehension-assisting prism describing) basic components of the bankruptcy process.

A debtor's bankruptcy petition creates a legal fiction known as a "bankruptcy estate,"[2] into which the debtor (or

*Williams v. Sears Roebuck & Co.*, 244 B.R. 858, 866 (S.D.Ga.2000). Creditors, then, must get in line and await orderly payment; creditors who were paid off by the debtor (hence, preferred over other creditors) just before bankruptcy must return those payments (deemed "avoidable preferences") to

trustee appointed to run the debtor's estate) places all of his assets. At that point the Bankruptcy Code prioritizes who gets paid first from the trustee-retrieved asset pool. *See* 11 U.S.C. § 507(a) (ranking, in repayment priorities, "First, administrative expenses" under 11 U.S.C. § 503, which include "the actual, necessary costs of preserving the estate," *id.*) and § 507(b) (creating "superpriority administrative claims" for, *inter alia*, new-financing based liens granted to new-financing lenders under 11 U.S.C. § 364(d)(1)).

Higher priority (*e.g.*, secured) creditors tend to get their claims (also known as "liens" on the debtor estate's property) paid first, while lower priority (*e.g.*, unsecured) creditors can wind up with less, if anything. Hence, creditors filing claims against the bankruptcy estate will want to claim a high peg on the re-payment priority pole. In Chapter 11 cases, the debtor (typically a business of some sort) seeks to reorganize and, upon confirmation of a reorganization plan (under which the debtor ultimately emerges from bankruptcy with some or all of its debts repaid), the repayment prioritization is settled.

But reorganizing debtors like Bland often seek "fresh financing" or "new financing" (hence, *post*petition loans) in order to continue operations while in bankruptcy.

Of course, lending to a known bankrupt obviously is risky, so the Code reassures such creditors by authorizing the bankrupt's trustee (with court approval) to grant them high-priority-repayment liens on the bankruptcy estate's property.

The NFL thus seeks high repayment priority. *See* 2C BANKR.SERVICE L.ED. § 20:346 (Nov.2003) ("Purpose of administrative priorities allowed under 11 U.S.C.A. § 364 is to induce reluctant creditors to offer credit to debtor in possession for use in reorganization").

Not everyone uses the same terms in this area of law, however. Courts and practitioners use terms like "superpriority status" or "superpriority administrative status" to "adequately protect" the NFL under 11 U.S.C. § 364(c)(1) (if the debtor or trustee is unable to obtain unsecured credit, the court may authorize new credit with repayment priority over any or all administrative expenses) and § 364(d)(1) (the bankruptcy court can authorize the trustee to obtain credit or new debt secured by an equal or senior lien on property of the estate that is subject to a lien if the trustee is unable to obtain such credit otherwise, and there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted).[3]

---

the estate for re-distribution according to the Code's re-payment prioritization scheme. *See In re RDM Sports Group, Inc.*, 250 B.R. 805, 811 (Bkrtcy.N.D.Ga.2000) (Central purpose of the Bankruptcy Code's preferences section is to discourage creditors from racing to the courthouse to dismember the debtor during its slide into bankruptcy); *accord In re Air South Airlines, Inc.*, 247 B.R. 153, 157–58 (Bankr.D.S.C.2000).

**3.** 11 U.S.C. § 364(c) and (d) provide:
(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative

expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
(3) secured by a junior lien on property of the estate that is subject to a lien.
(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or

Sometimes the § 364 option is deemed indispensable — a debtor can face immediate liquidation (rather than reorganization) without it, and unsecured creditors can lose the most with that result. Naturally, though, the NFL is in a position to extract a tough, "take-it-or-die" deal. *See In re W. Pac. Airlines, Inc.*, 223 B.R. 567, 573–74 (Bankr.D.Colo.1997) (Chapter 11 debtor-airline would be allowed to borrow aggregate of $30 million on superpriority basis, in order to obtain financing needed to prevent immediate cessation of its business and loss of value associated with its aircraft leaseholds; while terms of financing were onerous, and included granting authority to lender to appoint directors to debtor's board and to require debtor to assume and assign its leases, financing agreement was negotiated in good faith and was supported by creditors' committee, debtor was unable to obtain such a loan, most of which was unsecured, on any other basis, and only alternative, which was liquidation of debtor's business, presented dim prospects for recovery by creditors).

In severe situations bankruptcy courts can become solicitous. Even a loan from "mom" will suffice if she's the only port in the storm. *In re Devlin*, 185 B.R. 376, 377 (Bankr.M.D.Fla.1995) (debtor authorized to borrow money from, and grant Code § 364(d) superpriority lien to his mother, where unable to locate any other lender); *compare In re Phase–I Molecular Toxicology Inc.*, 285 B.R. 494, 496 (Bankr.D.N.M. 2002) (Chapter 11 debtor would not be permitted to borrow on secured basis from creditor that was also debtor's largest shareholder, given complete lack of evidence that debtor had approached any other lender for financing, or that proposed financing, which would be available only for short time, would preserve assets of estate or be in best interests of creditors).

Tensions and disputes most often arise, then, because moving NFLs further up the repayment priority scale can come at a lower-priority creditor's expense. Yet, with no such reshuffling, lower-priority creditors could risk a failed reorganization, which can translate into a substantially lowered, if not zeroed pay-out. Such creditors, then, may just "go with the flow." *See* 2C Bankr.Service L.Ed. § 20:380 (Nov.2003) ("Undersecured lienholders, by tacitly consenting to superpriority lien by either not objecting or withdrawing their objections to superpriority financing under 11 U.S.C.A. § 364(d), relieved debtor of having to demonstrate that they were adequately protected. *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D.Ga.1989)").

■ Given these ups and downs, courts require the debtor basically to show why "super-priority" financing is a good idea. Courts thus may require the debtor to show things like: (1) whether the proposed financing is an exercise of sound and reasonable business judgment; (2) whether alternative financing is available on any other basis; (3) whether the proposed financing is in best interest of the estate and its creditors; (4) whether any better offers, bids, or timely proposals are before the court; (5) whether the proposed financing is necessary to preserve the assets of the estate, and is necessary, essential and appropriate for the continued opera-

---

equal lien on property of the estate that is subject to a lien only if—
(A) the trustee is unable to obtain such credit otherwise; and
(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

tion of the debtor's business; (6) whether the terms of proposed financing are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender; and (7) whether the financing agreement was negotiated in good faith and at arm's length between debtor and proposed lender. *In re Farmland Indus., Inc.,* 294 B.R. 855, 880 (Bankr. W.D.Mo.2003); *see also W. Pac.,* 223 B.R. at 572.

These courts no doubt recognize that the NFL naturally will want to exert some bargaining power to protect its loan. *See Farmland,* 294 B.R. at 885–86 (When, as part of its decision on whether to approve proposed postpetition financing agreement, bankruptcy court evaluates whether terms of agreement are fair, reasonable, and adequate given circumstances of debtor-borrower and proposed lender, court should keep in mind that it is not impermissible for lender to use its superior bargaining power to obtain terms favoring it).

But there's a fairly thick layer of complexity involved with how an NFL winds up with a "super" or "very senior" lien on the bankrupt estate's property. It is not necessary to detail it all here, but one court summarized the process where a bankrupt's trustee (which can be the debtor himself, known as a Debtor in Possession or "DIP") seeks fresh financing from different lending-source tiers by offering higher and higher re-payment priorities (*i.e.,* "administrative-expense priority" classifications):

> Section 364 provides certain incentives that a trustee or debtor in possession may offer, with court approval, to induce potential lenders to undertake the risks involved in providing postpetition financing to a bankruptcy estate. These incentives include granting the lender when necessary under statutorily defined circumstances an administrative expense priority under § 364(b), a "super-priority" claim under § 364(c)(1), or a lien on unencumbered estate assets under § 364(c)(2) or (3), on account of the postpetition credit extended. Furthermore, section 364(d) provides that, under appropriate circumstances and after notice and a hearing, the court may authorize the obtaining of credit secured by a lien on encumbered property that is senior or equal to any existing lien on the property. 11 U.S.C. § 364(d).

*In re Cannonsburg Env't Assocs., Ltd.,* 72 F.3d 1260, 1266 (6th Cir.1996) (quotes, cites and alterations omitted). In other words,

> If the trustee or debtor in possession is unable to obtain either (i) unsecured credit as an administrative expense under [11 U.S.C.] § 364(b), or (ii) credit obtained under Code § 364(c), either with special administrative expense priority, secured by a lien on unencumbered property or secured by a junior lien on encumbered property, then the trustee or debtor may apply to the court for authorization to obtain credit or incur debts secured by a lien on encumbered property that is *senior* or equal to the existing lien on the property. This situation is governed by Code § 364(d), which delineates certain conditions that must be satisfied before a lien senior or equal to existing liens may be granted.

2 Norton Bankr.L. & Prac.2d § 38:7 (Sep.2003) (emphasis added; footnote omitted).

▮▮▮ Granting, in exchange for fresh financing, a "lien on encumbered property that is senior or equal to [an] existing lien on the property" results in the trustee "priming" any existing liens. The trustee must "adequately protect" the "primed" lenders, such as by granting them "replacement liens" on other debtor-estate property. This can all get reasonably

complicated, but again, courts basically sanction the § 364(d) senior status (and thus the "priming" of any existing liens) only where no one else is willing to lend:

> A lender of new funds would derive small benefit from an assurance of receiving [mere] administrative expense status [which is simply being pegged higher up the Code's repayment priority scale *without* the benefit of a security lien on specific property of the debtor] if the liquidation value of the debtor's unencumbered assets did not exceed the amount of postpetition credit sought. In such a case, the trustee or debtor in possession would not readily attract new funds without offering a senior or equal lien on previously encumbered property.

*Id.* (footnote omitted). Hence, the "§ 364(d) process" is considered rare and extraordinary, which is why "the trustee or debtor in possession must establish an inability to obtain the necessary credit by any method other than having such credit secured by a senior or equal lien on previously encumbered property." *Id.*

Much time and discussion is spent on the impact of a § 364(d) lien — most nota-bly providing "adequate assurance" to displaced secured lenders when a "super" senior lien is granted. *See id.* ("The most important prerequisite to the authorization of a senior or equal lien on previously encumbered property is the furnishing of [11 U.S.C.] § 361 adequate protection to existing secured interests to the extent of the value of their collateral, to compensate for the impairment of their rights").

■■ Considerable controversy arises, however, where an NFL wants security (hence, "cross-collateralization") for not only the "new" money he lends, but also his prepetition, *un*secured loans that he may have made. This area of law gets confusing, however, because courts and commentators use different terms to describe this process (*e.g.*, "crossover lien," "cross-collateralization").[4]

The process can be best understood by focusing on what an NFL wants: as much security (hence, a lien on the debtor's property, or some other form of collateral) as possible, especially if he fears that any new collateral might be inadequate. The NFL will thus seek the above-described senior (or "super-priority") lien on the

---

4. One source explains that

 [t]here are at least two kinds of cross-collateralization: (1) cross-collateralizing *pre*petition debt with *post*petition assets, which is also known as *"forward cross-collateralization"*; and (2) cross-collateralization of *post*petition debt with *pre*petition assets. The first type of cross-collateralization [what appellants here allege] is heavily criticized as preferential if the prepetition claim of the prepetition lender who obtains forward cross-collateralization is undercollateralized [hence, under-secured]. The second type of cross-collateralization is entirely proper in the context of a postpetition loan so long as any existing creditor whose collateral is encumbered by an equal or senior lien in favor of the lender is adequately protected as required under Code § 364(d)(1)(B). As to the propriety of a prepetition creditor making a postpetition loan and collateralizing the new loan with prepetition and postpetition assets, *see In re Antico Mfg. Co.*, 31 B.R. 103, 10 Bankr.Ct. Dec. (CRR) 1085 (Bankr.E.D.N.Y.1983). This type of cross-collateralization is "authorized" under Code § 364(c)(2) and (d)(1) because these sections authorize a lien on "property of the estate" to secure a postpetition loan. Code § 541(a)(1) and (7) define "property of the estate" to include both all legal and equitable interests of the debtor in property as of the commencement of the case and any interest in property that the estate acquires after the commencement of the case.

 4 Norton Bankr.L. & Prac. 2d § 87:22 n. 48 (*Effect of Failure to Obtain Stay*) (Sep.2003) (emphasis added); *see also* Carlson, *Post–Petition Security Interests Under The Bankruptcy Code*, 48 Bus. Law. 483, 497–506 (1993).

debtor's assets, one that will be paid off ahead of *all* other administration expenses and creditors accorded high priority by § 507(b). But to cross-collateralize is to get *pre*petition loans secured by *post*petition assets and vice versa (hence, crossing pre– and postpetition debts with assets):

> Cross-collateralization is a term describing the process whereby a lender advancing funds to a bankruptcy debtor obtains a security interest on *all* the debtor's assets, *both* for the new funds advanced *and* the prepetition indebtedness to the lender. In other words, cross-collateralization means that equity of the debtor in *pre*petition assets is used to secure the *post*petition obligation to the creditor, equity in *post*petition property is used to secure the *pre*petition obligation to the creditor, and, if liquidation ensues, both prepetition and postpetition obligations are paid ahead of unsecured debts.

9B Am.Jur.2d Bankruptcy § 1562 (May 2003) (footnote omitted; emphasis added).

Lower-tier (unsecured) creditors naturally scrutinize this result, since often their only hope of obtaining any sort of repayment on their claims comes from the debtor's unencumbered assets (*i.e.*, those not already tied up by secured lenders' security liens). The NFL can jeopardize that interest by seeking a "crossover" (cross-collateralizing) lien aimed at (1) giving it security for its old (prepetition) loan by encumbering new, postpetition collateral; plus (2) security for the postpetition loan on his *pre*petition collateral. That can consume unencumbered assets (*e.g.*, next year's farm crop yield) on which the unsecured creditors may have been counting for repayment.

Lower-tier creditors may have little to object to point (2) above (*i.e.*, granting NFL's, pursuant to § 364(d), security for the postpetition debt on the NFL's *pre*pet-

ition collateral), since any surplus value in the prepetition collateral is an asset of the debtor's estate and thus available to be given to secured lenders in the Chapter 11 proceeding.

But under point (1) — securing the NFL's unsecured (or undersecured) *pre*petition loan with *post*petition assets — objections can quickly fly in light of *In re Saybrook Mfg. Co.*, 963 F.2d 1490, 1494–95 (11th Cir.1992) ("cross-collateralization is not authorized as a method of postpetition financing under section 364 .... [and] it is beyond the scope of the bankruptcy court's inherent equitable power because it is directly contrary to the fundamental priority scheme of the Bankruptcy Code"); *In re Willingham Invs.*, 203 B.R. 75 (Bankr. M.D.Tenn.1996).

■ Put another way, a lender cannot "cross-collateralize or 'refinance and recollateralize' a *pre*petition secured debt secured by substantially all of the debtor's assets," *In re Tri–Union Dev. Corp.*, 253 B.R. 808, 814 (Bankr.S.D.Tex.2000) (emphasis added), but note the "underscured" distinction:

> [t]he effect of forward cross-collateralization is to transfer postpetition assets that would otherwise be available to pay general unsecured creditors [like the Farmworkers here] to the repayment of the prepetition claim of the lender. If the lender's prepetition claim is seriously *undersecured*, forward cross-collateralization may work a great injustice and in fact violate the well-established case law that the Bankruptcy Court cannot create priorities within the statutory priorities.

4 Norton Bankr.L. & Prac. 2d § 87:22 (*Effect of Failure to Obtain Stay*) (Sep.2003) (quotes omitted). That distinction warrants some additional, surrounding context:

Generally speaking, cross-collateralization occurs to a limited extent in almost every case. Under [11 U.S.C.] § 363(e) any creditor whose collateral, including cash collateral, is used by the debtor is entitled to a replacement lien on other assets as adequate protection for any diminution in the value of the creditor's interest in such property caused by the debtor's use.

*Id.* As an example,

if proceeds of prepetition collateral (*i.e.* cash collateral) are used by the debtor, the creditor with an interest in such collateral is entitled to a replacement lien on the debtor's other assets, including *its* postpetition assets, to adequately protect the creditor's interest in such cash collateral. The act of providing the creditor with the replacement lien on postpetition assets to protect the creditor's interest in such collateral is a form of cross-collateralization of the creditor's prepetition claim. A portion of the debtor's prepetition debt is now secured by the replacement lien on postpetition assets.

*Id.* But one "form of cross-collateralization .... has come under intense judicial scrutiny," *id.*, and that

occurs when a postpetition lender who is also a prepetition creditor of the debtor requires the debtor to secure the *entire amount* of its prepetition debt with *all* of the debtor's postpetition assets as a condition to extending postpetition credit, often without regard to (1) the amount of postpetition loans actually made by the lender to the debtor, (2) whether the lender's prepetition claim is oversecured or *undersecured*, and (3) the amount of adequate protection the lender might be entitled to based upon the actual usage and diminution of its collateral. The wholesale cross-collateralization of prepetition debt with postpe-

tition assets can effect a massive *preference* in favor of the prepetition creditor *if* the prepetition creditor is undercollateralized.

*Id.* (emphasis added).

Such forward cross-collateralization "is preferential" (and thus voidable) "because a prepetition secured creditor is *not* ordinarily entitled to look to postpetition assets to pay its prepetition claim." *Id.* Hence, "postpetition assets that are not first generation cash proceeds of prepetition assets might not be subject to the lender's prepetition security agreement," *id.*, and "by granting forward cross-collateralization" (hence, obtaining this result from a bankruptcy court), "the debtor is dedicating property that would otherwise be available to pay unsecured creditors to the payment of what might be the lender's deficiency claim." *Id.*

As a consequence, an *undersecured* lender's prepetition claim (and any deficiency between that claim and what can be collected on the collateral securing it) gets preferred (by the additional collateral) "over the claims of the debtor's other general unsecured creditors." *Id.* As will be discussed in the next section, this is, in essence, what the Farmworkers claim has occurred here.

## B. Factual Background

The background facts are basically undisputed. Bland borrowed money to farm onions. R. 2. By 11/01, he defaulted on repayments and filed for Chapter 11 protection. *Id.* AgSouth Farm Credit, ACA (AgSouth), his secured lender, agreed to provide up to $3 million in postpetition (hence, new financing, thus making it an NFL) in exchange for a first priority lien on Bland's (the Debtor's) (a) real property (with the exception of specified real estate holdings); and (b) his 2001 and 2002 onion

crops, onion inventory, accounts receivable and proceeds therefrom, etc. R. 2.

A group of banks (the "Bank Group"), however, held $10 million prepetition, secured claim. R. 17 at 2; R. 27. Under § 364(d), however, the liens granted to AgSouth "primed" (took higher priority over) those liens, R. 2, and the Farmworkers raised no objection.

By 12/4/01, however, Bland needed more money, but the Bank Group wanted adequate protection under 11 U.S.C. § 364(d)(1)(B) for its loans since its liens had been primed by the first round of (AgSouth) new financing. R. 3. So, he moved the court for leave to incur more ($1.5 million) secured debt under § 364(d), to be secured by AgSouth's security interests in the Debtor's 2001 and 2002 onion crop, onion inventory, accounts receivable and the proceeds therefrom, thereby further priming the Bank Group. R. 4.

While the court approved the motion, R. 5, that primed the Bank Group's lien for the second time, so the court also granted the group adequate protection in the form of a perfected lien on *all* of Bland's real and personal property, including proceeds therefrom. R. 5 ¶ 9, *as amended* 1/17/02 (providing that the grant of the perfected security interest to the Bank Group was effective on 12/14/01); R. 6 at 2. Again, the Farmworkers raised no objection.

Still running short of cash by 8/02, Bland entered into a third postpetition financing agreement and requested leave to borrow another $4.5 million—this time from Flag Bank (AgSouth by this time declined to lend any more money). R. 10. He needed the money to plant his 2002–03

onion crop. *Id.* ¶ 7. He therefore requested that the court grant Flag various first priority security interests. R. 10 ¶ 9.

The court conducted a hearing and heard testimony on the onion farm's poor performance during the 2002 crop year. R. 14 at 10–32. Unsecured creditors were still going unpaid by that time, *id.* at 20–21, but expenses had been reduced and new-financing, witnesses opined, could salvage the farm. *Id.* at 31–32; *see also id.* at 41–42, 50–51.

At a later hearing, Bland clarified that the third round of new financing ($4.5 million from Flag Bank) would "take out" (pay off) AgSouth's loan upon the court's approval of the next (9/10/02) interim financing order. R. 16 at 4–5. He planned to pay Flag off (using his 2002–03 onion crop yield) by 9/15/03. *Id.* at 6. Counsel explained:

> The reason for [Flag Bank's taking AgSouth out] is that Flag Bank obviously has the most at risk in this case. Their prepetition claim, the principal amount is slightly in excess of 10 Million Dollars,[5] exclusive of attorney's fees and interest. But they have the most at risk. Part of what motivates them now is the fact that they have the most at risk, they want control, if you will, of the debtor's collateral. They want to know where he is spending his money. They want to know what he is spending his money on.

*Id.* at 7 (footnote added).

The court entered an interim order on 9/10/02, noting that "Flag for itself and for a group of participant banks for which it

---

**5.** This is the same as the "Bank Group's" aforementioned, $10 million in prepetition loans. Flag was part of the group, and evidently lent the lion's share of that money, but counsel confused the record by failing to distinguish that fact (*i.e.*, that Flag money evi-

dently formed a substantial part of the $10 million prepetition financing, but that now Flag was standing alone in lending an additional, $4.5 million *post*petition (thus making it an NFL)).

acts as agent (the 'Bank Group')," had filed its proof of claim against the estate for over $10 million, R. 17 at 2 ¶ 2; the court had previously authorized replacement liens on Bland's 2001–02 onion crops to secure the Bank Group's loans, *id.* ¶¶ 4–5; and Bland was unable to "obtain adequate unsecured credit allowable under section 503(b)(1) as an administrative expense." *Id.* ¶ 6. Hence, the court authorized, under § 364(c)(1), security for the new "Flag" postpetition financing ("taking out" the AgSouth debt) by granting Flag

> an allowed claim [*i.e.*, a senior lien] which allowed claim shall be payable from and have recourse to, in *addition* to the property of the Debtor that is made subject to security interests and liens, *any* unencumbered *pre*– and postpetition property of the Debtor. . . .

*Id.* § 11 (emphasis added); *see also id.* § 13 (granting Flag other "perfected priority senior priming security interests in and liens upon *all* of the Debtor's real estate . . . .") (emphasis added); § 16 (protecting Flag's senior liens from subordination). The court also granted the Bank Group senior liens subject to Flag's. *Id.* § 14.

Finally, the court directed Bland to use this round of postpetition financing to pay off AgSouth, and "once said AgSouth loan is paid off, Flag shall have all of the liens and security interests of AgSouth, and the Debtor shall remit the proceeds of AgSouth's former collateral to Flag." *Id.* § 33. The Bank Group would then reap those interests, subject to Flag's liens. *Id.*

Citing *Saybrook*, the Farmworkers objected, R. 18, and the court conducted a hearing on same. R. 20. Amending its 9/10/02 order on matters here not relevant, the court overruled those objections and entered its final order on 10/7/02, R. 21, from which 105 Bland farm workers owed $216,000 have appealed. R. 29–30; *see also* R. 23–28 (Farmworkers' proof of claims); R. 20 at 39, 154.

### C. Arguments On Appeal

The Farmworkers argue, *inter alia*, that the bankruptcy court erred by authorizing impermissible cross-collateralizing, thereby jeopardizing any potential pay-out on their unsecured claims. Doc. ## 2, 9. Flag insists that's not the case because it made the postpetition loan, while another lender (the Bank Group) made the prepetition loan, and cross-collateralizing only occurs when the same lender makes both. Doc. # 7–8, 10. Appellants respond that Flag is the real lender (*i.e.*, it is "the Bank Group") but has simply engaged in semantics to disguise that fact. Doc. # 9 at 5–8. Flag's counter-arguments are addressed *infra*.

#### 1. Mootness

 Flag preliminarily argues [6] that the appeal is moot. It tracks the line of reasoning running through cases such as *In re Adams Apple, Inc.*, 829 F.2d 1484 (9th Cir.1987) (appeal from financing order moot; cross-collateralization clauses protected under Code § 364(e)); 6 NORTON BANKR.L. & PRAC. 2d § 148:61 (*Effect of Failure to Obtain Stay*) (Sep.2003). But *Saybrook* says otherwise. 963 F.2d at 1493.

#### 2. Different Lenders

 Flag next argues that cross-collateralization occurs, per *Saybrook*, only when a postpetition lender's unsecured, prepetition claims are, as a result of court-

---

**6.** Flag's "jurisdictional" arguments (doc. # 7 at 1) are without merit and require no further discussion.

approved fresh-financing, given priority over all other unsecured prepetition claims. Doc. # 7 at 19. In contrast to *Saybrook*, where the same lender lent money pre– and postpetition *and* received postpetition liens for its prepetition claims, here there is no such lender. The Bank Group is the prepetition lender, while Flag is the postpetition lender. *Id.*

The Farmworkers point to bankruptcy court hearing statements affirming the fact that Flag is part of the Bank Group. Doc. # 9 at 5–8. The problem for the Farmworkers, however, is that it just does not matter at this point. To run afoul of *Saybrook*, the bankruptcy court's new-financing-authorization order must be shown to have violated "the fundamental priority scheme of the Bankruptcy Code," *Saybrook*, 963 F.2d at 1495, and that means that some creditor suffers prejudice as a result.

Here it is undisputed that the Farmworkers are *unsecured* creditors, so unless they can show that there were unsecured (unencumbered) assets consumed by Flag's (or the Bank Group's) cross-collateralization (as authorized by the third financing order), their *Saybrook* dog won't hunt. In *Saybrook*, for example, the prepetition lender (owed $34 million prepetition) vastly improved its position (its prepetition debt collateral was worth only $10 million, so it was substantially undersecured) by lending $3 million postpetition to facilitate the debtor's reorganization. In exchange, it received a security interest in the debtor's pre– and postpetition property. It thus used postpetition property to secure its $34 million in prepetition debt, thereby improving its re-payment priority position to the detriment of unsecured claimants. *Id.* at 1491.

The *Saybrook* court emphasized that "[t]his arrangement enhanced [that lender's] position vis-a-vis other unsecured creditors ... in the event of liquidation." *Id.* Those creditors thus could show prejudice. But here the Farmworkers failed to object to the second financing order, which granted "Flag Bank" [hence, the Bank Group, as appellants would have it] "a lien" (hence a perfected security interest in) in all of the debtor's "property, both real and personal, and proceeds therefrom...." R. 5 ¶ 9. So, by the time the court entered its third financing order—from which the Farmworkers now appeal—there was no unsecured property left to be subjected to the superpriority lien that the third order granted to Flag.

In response to this, the Farmworkers reverse course and insist that the second financing order only granted such a lien to Flag, not the Bank Group. Doc. # 9 at 7–8. But they overlook the bankruptcy court's later clarification, as reflected in its third financing order, that in the second financing order the court had "granted the Bank Group replacement liens ... in *all* of the Debtor's real and personal property ... and the proceeds therefrom." R. 17 ¶ 4 (emphasis added).[7] The Farmworkers

---

7. This is consistent with representations made by Flag's counsel to the bankruptcy court: That [*i.e.*, the $10 million in prepetition loans] is not Flag's debt.... There are two separate entities. There's the [B]ank [G]roup of which Flag is a part of the [B]ank [G]roup, and then there's Flag individually that did the postpetition financing. R. 20 at 63. Counsel reaffirmed to the court that Flag was not refinancing the "Bank Group" debt, but in fact lending new ($4.5 million) *postpetition* funds to the Debtor. *Id.* at 63–64. Flag's counsel did concede, however, that Flag was acting as the Bank Group's agent, but only to secure postpetition administrative priority for that group's prepetition lien, since it enjoyed the right to adequate protection under § 364(d)(1)(B) in exchange for having its $10.2 million lien primed (now

did not challenge either ruling (*i.e.*, the second financing order nor the third order's clarification of what the second order meant).

■■■■■ Thus, there was no unsecured property left to be "cross-collateralized" by the third financing order. The Farmworkers seem to acknowledge this by conceding that the Debtor's unencumbered assets by this point "may [have been] *de minimis.*" Doc. # 2 at 2–3. By this point in the process millions of dollars had been loaned, which means the Farmworkers waited too long to seek relief.[8] The entry of the third and final financing order, then, did nothing to improve the lien position of the Bank Group (and thus Flag's participation in it), at the Farmworkers' expense by crossing over to collateralize prepetition, unencumbered assets to secure a previously uncollateralized (hence an unsecured or undersecured) loan.

In addition, the bankruptcy judge thoroughly and thoughtfully considered the possibility that, based on then-*future* crop yields, there *could* be some upside for the unsecureds like the Farmworkers, R. 20 at 171–73, thus possibly according a windfall (at the Farmworkers' expense) to Flag. *Id.* But he also expressly found that (a) no one else was willing to lend the Debtor any more money; and (b) if the court did not approve the third financing order, the unsecured creditors (including the Farm-

workers) would "receive nothing. Their only hope of payment from the assets of the debtor[, then, would come from] the successful reorganization of this debtor." R. 20 at 175; *see also id.* at 176 (court considered other lending possibilities but found that the Flag loan was "just the best deal available").

This Court has reviewed the record and finds no clear error in these findings (nor have appellants shown any). On these additional grounds (*i.e.*, any error in authorizing otherwise-impermissible cross-collateralization was harmless), then, the bankruptcy court must be affirmed. In light of this result, it is not necessary to reach the remaining arguments on appeal.

## III. CONCLUSION

In that the entry of the third financing order did nothing to improve the Bank Group's position, no "*Saybrook* violation" has been shown, so the judgment of the bankruptcy court therefore is *AF-FIRMED.* Appellee Flag Bank's motion to file a supplemental brief (doc. # 10) is *GRANTED.*

---

for the third time) by Flag's $4.5 million in new financing. *Id.*

8. Bankruptcy is (compared to ordinary litigation in the non-bankruptcy side of this Court), a fast-moving process (businesses want to reorganization quickly, creditors want to get paid quickly, and courts want to clear their dockets quickly), so those who snooze lose. The Farmworkers' counsel invoked the bankruptcy judge's sense of "equity," R. 20 at 154 ("I represent 105 impoverished farmworkers

who are owed $216,000") thereby reminding the judge that equitable powers may be exercised in bankruptcy. A creature of equity, however, is laches. Unsecured creditors cannot sleep on their rights, let millions of dollars be loaned and thus placed at risk, then complain (too) long after the fact about the "equities" of the deal. Here the Farmworkers basically did just that by not timely objecting to the second financing order.